IRVINE K. FURMAN AND LORENA K. FURMAN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4813–63. Filed January 10, 1966.

*Samuel L. Payne* and *Frank C. Decker*, for the petitioners.
*Eugene Boyd Smith*, for the respondent.

TANNENWALD, *Judge:*[1] Respondent determined deficiencies in petitioners' income tax for the years 1960, 1961, and 1962 in the amounts of $613.34, $987.22, and $1,217.59, respectively, initially on the theory that the income of a trust was being distributed to them through its use to discharge their legal obligation and/or accumulated for them in the form of increased equity in the reversion. In his first amended answer respondent contended, in the alternative, that the trust was invalid and that consequently certain rental deductions should be disallowed with the result that the deficiencies were alleged to be $605.76, $1,036.04, and $1,152.13, respectively. In his second amended answer respondent made minor modifications in his allegations and proposed deficiencies of $638.01, $1,036.04, and $1,267.53 for 1960, 1961, and 1962, respectively.

### FINDINGS OF FACT

Certain facts have been stipulated by the parties and are found accordingly.

Petitioners (hereinafter sometimes referred to as Irvine and Lorena) are husband and wife. During the taxable years in issue they resided in Jacksonville, Fla., and filed their joint Federal income tax returns for such years with the district director of internal revenue, Jacksonville, Fla.

During the years in issue Irvine was a physician engaged in practice in Jacksonville and Lorena was a housewife. They had five minor children.

Since October 19, 1956, petitioners had owned, as tenants by the entirety, property located in Jacksonville and denominated 2819-21 Oak Street. During 1957, petitioners constructed on the property a two-story building at a cost of approximately $27,500. From completion of construction and through the taxable years involved herein, the lower story, 2819 Oak, was used by Irvine as his professional office, and the upper story, 2821 Oak, was used by petitioners and their family as a personal residence.

---

[1] This case was heard by Judge Morton P. Fisher and briefs were duly filed. Judge Fisher died on Feb. 11, 1965. This case, not having been disposed of, was reassigned to Judge Theodore Tannenwald, Jr., on Aug. 17, 1965, and notice was given to the parties that any request for rehearing or reargument might be presented to him within 30 days. No such requests have been received.

In April 1957, petitioners executed a note in the principal sum of $25,000 and bearing 5-percent interest in favor of the Independent Life & Accident Insurance Co. (hereinafter referred to as mortgagee). Concurrently, petitioners executed, as security for said debt, a mortgage deed covering the property. On May 19, 1959, petitioners executed a note in the principal sum of $8,000 and bearing 5½-percent interest in favor of the mortgagee and concurrently executed a second mortgage deed covering the property. The monthly payments of principal and interest on the $25,000 note and the $8,000 note were $265 and $103, respectively. Under these terms of payment, both notes would be satisfied during 1967.

On June 30, 1960, a document entitled "Trust Indenture, Irvine K. Furman Trust" was executed. It named Irvine as "Donor" and Lorena as Trustee. The document recited that the trust was established for the benefit of the donor's children and that the donor had delivered the Oak Street property to the trustee. The indenture was to be construed and rights, duties, and obligations flowing therefrom were to be determined under Florida law. The document contained the following terms:

### ARTICLE III.

#### Termination of Trust

This Trust shall terminate on December 1, 1970, or upon the death of the survivor of the income beneficiaries of this Trust, whichever shall first occur. * * *

### ARTICLE IV.

#### Trustee—Powers

\* \* \* \* \* \* \*

3. The Trustee shall have the power and authority in addition to such power and authority as conferred by the laws of the State of Florida, as follows:

(a) To invest and reinvest the trust funds in property of any kind, real, personal, or mixed, or in choses in action, or in any business, irrespective of any statute, case, rule or custom limiting the investment of trust funds, except the Trustee shall not sell the * * * [Oak Street property], unless permission is given in writing by the Donor.

\* \* \* \* \* \* \*

### ARTICLE V.

#### Distribution and Use of Income

1. My Trustee shall collect and receive the income from the Trust Estate, and after paying and discharging all necessary expenses incident to the administration of the Trust, shall use such portion of the net income of this Trust as may be needed for the care, comfort or education of my children. Any such portion of the net income of this Trust not expended by my Trustee under this paragraph may be accumulated * * *

\* \* \* \* \* \* \*

4. Upon the termination of this Trust as hereinabove provided the Trustee shall distribute the corpus to the Donor, if living, otherwise to his estate and shall

distribute any accumulated income to my children, in equal shares if living, otherwise to their respective estates.

On July 1, 1960, Irvine, as grantor, conveyed to Lorena, as grantee, the Oak Street property. The conveyance was subject to the mortgages hereinbefore mentioned. The deed contained the following statements:

It being the intention of the Grantor, that the Grantee shall assume the said liabilities and make the timely payments on the first above mentioned mortgage as provided therein in the sum of $265.00 on the first of each month, and make the payments as provided in that second mortgage in the sum of $103.00 per month on the first of each month.

\* \* \* \* \* \* \*

To HAVE AND TO HOLD, the same in fee simple forever.

The deed was signed and acknowledged by both Irvine and Lorena.

Neither the trust indenture nor the deed was recorded on the county records, nor was the mortgagee notified of the change of ownership.

On July 1, 1960, an instrument entitled "Lease" was executed on the lower story and office portion of the property, 2819 Oak, by the trustee as lessor and Irvine as lessee. The monthly rent was $350 and the period of the lease was from July 1, 1960, to June 30, 1962.

On the same day, the trustee and Irvine executed a lease covering the upper story and residential portion of the property, 2821 Oak, at a rental of $75 per month. The period of the lease was the same as the lease covering 2819 Oak.

In each of the taxable years involved, petitioners filed a joint application, as individuals, for homestead exemption of the Oak Street property with their county tax assessor. Each application was granted.

On their Federal income tax returns for 1960, 1961, and 1962, petitioners claimed business expense deductions of $2,100, $4,200, and $4,200, respectively, for the annual rental payments made by Irvine on the lower story. Petitioners also claimed depreciation on 50 percent of the adjusted basis of the Oak Street property for the period prior to its conveyance to Lorena as trustee.

In its Federal income tax returns for its initial taxable year of July 1 to December 31, 1960, and the years 1961 and 1962, the trust included as income Irvine's payments under the leases and claimed depreciation on an "Office Bldg.—Dwelling."

During the years in issue, the trust made the payments to the mortgagee required by the notes of 1957 and 1959 and claimed deductions for the portion of the payments representing interest.

## OPINION

Both petitioner and respondent have argued at length as to the validity of the trust herein under Florida law. In our judgment, this issue is not material to our decision. We shall assume, although the

evidence is something less than overwhelming, that a valid trust was created under Florida law.[2]

A finding of validity under State law, however, does not mean that the trust will necessarily be recognized for tax purposes. It cannot be gainsaid that a taxpayer has "the legal right * * * to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits." See *Gregory* v. *Helvering*, 293 U.S. 465, 469 (1935). While this may be doctrine, it is not dogma and certainly it does not confer a license to substitute form for substance. As has recently been stated: "It is always open to the Commissioner to assess deficiencies on the ground that regardless of regularity of form as a matter of plutological reality, there was no substantial change in economic ownership." *Burde* v. *Commissioner*, 352 F. 2d 995 (C.A. 2, 1965).

The inescapable conclusion flowing from the touchstone of economic reality is that the trust should not be recognized and that petitioners should be treated as the owners of the Oak Street property for Federal income tax purposes. We rest our decision on the *totality* of the following considerations:

(1) The trustee was Lorena. There is no evidence that she did anything more than passively acquiesce in Irvine's wishes, much less act independently of his wishes. Cf. sec. 672(c); *Hall* v. *United States*, 208 F. Supp. 584 (N.D.N.Y. 1962); see *White* v. *Fitzpatrick*, 193 F. 2d 398, 402 (C.A. 2, 1951), certiorari denied 343 U.S. 928 (1952).

(2) Under section 3(a) of article IV of the trust indenture the Oak Street property could not be sold without Irvine's written consent.

(3) After giving the trustee broad powers to deal with the trust property, Irvine withdrew the trustee's power to sell the Oak Street property, the *only* significant corpus of the trust,[3] without his per-

---

[2] It is arguable that Irvine acted on Lorena's behalf in creating the trust and conveying to it property held by them as tenants by the entireties. *Anderson* v. *Carter*, 100 S. 2d 831 (Fla. Dist. Ct. App. 1958); *Gerson* v. *Broward County Title Co.*, 116 S. 2d 455 (Fla. Dist. Ct. App. 1959). Furthermore, the absence of Lorena's name in the body of the deed would probably not invalidate the conveyance, since she signed and acknowledged the instrument. 4 Tiffany, Law of Real Property, sec. 967 (3d ed. 1939); 4 American Law of Property, sec. 18.28 (Casner ed. 1952); cf. *Evans* v. *Summerlin*, 19 Fla. 854 (1883). Moreover, although Lorena did not sign either the trust indenture or the deed as a grantor, she did sign the indenture as trustee and the deed as grantee. Under these circumstances, we think that she or anyone claiming through her would be estopped from denying the validity of the transfer. Even though petitioners as individuals applied for and received a homestead exemption from taxation for the Oak Street property during the years in issue, such fact would not cause the trust to fail, under Florida law, for lack of a res. Sec. 192.12, Fla. Stat. Ann., provides that the exemption is granted only to persons who have "the legal title or beneficial title in equity to real property," but the Florida courts have extended the exemption to any right or interest the head of a family may hold in land, including the right to possession. *Bessemer Properties, Inc.* v. *Gamble*, 158 Fla. 38, 27 S. 2d 832 (1946); cf. *Manda* v. *Sinclair*, 278 F. 2d 629 (C.A. 5, 1960). Finally, the failure to record the deed and trust indenture would not *per se* void the trust under Florida law. See Fla. Stat. Ann., sec. 695.01 (1958).

[3] Indeed, the evidence before us indicates that the corpus consisted solely of the Oak Street property during the taxable years in question.

mission. This effectively emasculated Lorena's power to manage the trust and placed such power in Irvine's hands.

(4) Irvine retained the reversionary interest. By the terms of the instrument, the corpus of the trust was to revert to him on December 1, 1970, or on the death of his last surviving child, whichever occurred first.

(5) Except for the district director of internal revenue, no one (including the mortgagee) was notified of the change in ownership. Neither the trust indenture nor the deed was ever recorded.

(6) Under article V of the trust indenture, the trustee was directed to pay all "necessary expenses incident to administration of the Trust" and use such portion of the remaining income for the necessary care, comfort, or education of petitioners' five minor children.[4] The balance of the net income was to be accumulated for their benefit. However, the direction to use or accumulate income for the children was meaningless during the years in question, since trust receipts in each year were less than trust expenditures for mortgage principal and interest, Federal income taxes, and other miscellaneous expenses.[5] As a consequence, the beneficiaries, in reality, had no beneficial interest in the income during the years in question.[6] Cf. *Samuel Yanow*, 44 T.C. 444, 452–453 (1965), on appeal (C.A. 3, Sept. 23, 1965).

(7) Petitioners applied for homestead exemption in their personal capacities.[7]

(8) Prior to the establishment of the trust in June 1960, petitioners as the owners allocated the use of the property for purposes of depreciation equally between office and residence (an allocation not questioned by respondent).[8] Yet the rental for the office portion, which would ordinarily be a deductible business expense, was set at $350 per month, or over 80 percent of the total rental of $425 paid by Irvine under both leases. Petitioners offered no evidence to explain this difference in treatment.

---

[4] The stipulation states that during the years involved herein, petitioner had five minor children. On his 1960 return, however, petitioner only claimed four children as dependents.

[5] The leases required petitioner as lessee to pay all taxes assessed against the Oak Street property. There is no provision relating to insurance but, in view of the insufficient income of the trust, premiums were in all probability paid by the petitioners.

[6] Each mortgage contained a prepayment privilege but there is no evidence that the privilege was exercised during the taxable years involved. If the specified rental was continued after the years in issue, the same result would obtain until satisfaction of the mortgage debt in 1967 Indeed, the gap between receipts and expenditures would widen as time progressed, since the amount of each payment attributable to deductible interest would decrease, and the portion attributable to nondeductible amortization would increase, with a consequent increase in Federal income taxes. Changes in the lease arrangements in subsequent years could, of course, alter this result.

[7] Although this fact may not impair the validity of the trust under Florida law (see fn. 2, *supra*), it has a bearing on the recognition of the trust for Federal income tax purposes.

[8] In his amended answer, respondent sets forth the amount of depreciation allowable to petitioner in respect of the office portion of the premises. Respondent's allowances appear to be based upon an allocation of one-half to the office and one-half to the residence, which conforms to the allocation by petitioners in their 1960 income tax return covering the first half of that year. Petitioners have not objected to these allowances.

Under all the foregoing circumstances, we think that the trust arrangement should be treated as a nullity for Federal income tax purposes. Our decision is not premised upon the retention of dominion and control over the trust by Irvine, but on the absence of economic reality. We do not believe that sections 671 through 678 of the Internal Revenue Code of 1954 preclude a decision that, in an extreme case such as this, there is such lack of economic reality as to nullify the existence of a valid trust for Federal income tax purposes. See S. Rept. No. 1622, 83d Cong., 2d Sess., p. 365 (1954) ; H. Rept. No. 1337, 83d Cong., 2d Sess., pp. A–211, A–212 (1954) ; cf. *Van Zandt* v. *Commissioner*, 341 F. 2d 440 (C.A. 5, 1965), affirming 40 T.C. 824 (1963), certiorari denied 382 U.S. 814 (1965).

Our decision should not be construed as holding that we will disregard a trust for Federal income tax purposes in all situations involving transfers in trust and leasebacks. The decided cases reveal the standards to be applied. *Brown* v. *Commissioner*, 180 F. 2d 926 (C.A. 3, 1950), reversing 12 T.C. 1095 (1949), certiorari denied 340 U.S. 814; *Skemp* v. *Commissioner*, 168 F. 2d 598 (C.A. 7, 1948), reversing 8 T.C. 415 (1947) ; *John T. Potter*, 27 T.C. 200, 214 (1956), acq. 1957–2 C.B. 6; *Albert T. Felix*, 21 T.C. 794, 803 (1954) ; compare *Van Zandt* v. *Commissioner*, *supra*, with *Alden B. Oakes*, 44 T.C. 524 (1965), on appeal (C.A. 6, Oct. 6, 1965).[9] The instant arrangement simply does not pass muster.

Petitioner has sought to "eat, drink and be merry" at the expense of the Federal fisc. See *Burde* v. *Commissioner*, *supra* (Judge Friendly concurring). This he cannot do. We hold that petitioners' tax liability for the periods involved should be determined as though the trust had never been established.

In view of our decision, we express no opinion as to nondeductibility of the rental payments to the trust on the ground that Irvine's reversion constituted "equity" within the meaning of section 162(a)(3). See *Hall* v. *United States*, *supra* at 588 (alternative holding).

We also need not resolve the issue so vigorously argued by both petitioners and respondent as to whether the income of the trust was taxable to petitioners on the ground that such income—to the extent of the payments of mortgage principal and interest—was used to discharge their legal obligation and, therefore, "distributed to the grantor" under section 677(a)(1). Whether one has a legal obligation within the meaning of section 677(a)(1) of the Code and section 1.677(a)–1(d), Income Tax Regs., after he transfers to a trust prop-

---

[9] The presence or absence of business purpose in lessor-lessee transactions of the type involved herein is not in and of itself determinative. The fact that there may be a business purpose for a transaction does not necessarily mean that the transaction has economic substance for tax purposes. Similarly, the lack of a business purpose does not necessarily mean that there is no such economic substance. Compare *Van Zandt* with *Alden B. Oakes*.

erty burdened by a debt and requires the trust to pay the debt,[10] is difficult to fathom in view of the imprecise rationale of prior decisions. Compare *Victor Rakowsky*, 17 T.C. 876 (1952); *Ralph W. Conant*, 7 T.C. 453 (1946); *Clifton B. Russell*, 5 T.C. 974 (1945), affirmed per curiam 154 F. 2d 829 (C.A. 1, 1946); *Herbert A. Loeb*, 5 T.C. 1072 (1945), affd. 159 F. 2d 549 (C.A. 7, 1946); *James L. Knight*, 39 B.T.A. 436 (1939) with *Easson v. Commissioner*, 294 F. 2d 653, 661 (C.A. 9, 1961), reversing 33 T.C. 963 (1960); *Edwards v. Greenwald*, 217 F. 2d 632 (C.A. 5, 1954); *Hays' Estate v. Commissioner*, 181 F. 2d 169 (C.A. 5, 1950), reversing 12 T.C. 210 (1949); [11] compare also *Estate of Craig R. Sheaffer*, 37 T.C. 99 (1961), affd. 313 F. 2d 738 (C.A. 8, 1963), with *Estate of Annette S. Morgan*, 37 T.C. 981 (1962), affirmed per curiam 316 F 2d 238 (C.A. 6, 1963); see Rev. Rul. 64–240, 1964–2 C.B. 172; Fishman, "Income Tax Aspects of Third Party Payments of Taxpayer Obligations," 19th Ann. N.Y.U. Tax Inst. 31, 40 (1961); Notes, 42 Ore. L. Rev. 339 (1963), 17 Stanford L. Rev. 98 (1964).

Nor need we resolve the issue whether payment of the mortgage debt acts as an accumulation of income "for future distribution to the grantor" within the meaning of section 677(a)(2)—a question not readily answered. Cf. *Riggs National Bank v. United States*, 352 F. 2d 812 (Ct. Cl. 1965). We note in passing, however, that at least to the extent of the amortization portion of the mortgage payments, the value of Irvine's reversionary interest [12] was enhanced.

Respondent disallowed $425 of petitioners' claimed deduction for "rents and utilities expenses" in 1960 and disallowed $268.37 of petitioners' claimed deduction for taxes in 1962. Petitioners do not contest these adjustments. To the extent that these disallowances are not otherwise covered by our decision, we sustain respondent's determination with regard thereto.[13]

*Decision will be entered under Rule 50.*

---

[10] The question of whether the instant transfer resulted in the realization of gain or loss is not before us. Cf. *Loeb v. Commissioner*, 159 F. 2d 549, 551 (C.A. 7, 1946), affirming 5 T.C. 1072 (1945); *Joseph B. Simon*, 32 T.C. 935 (1959), affd. 285 F. 2d 422 (C.A. 3, 1960); *Magnolia Development Corp.*, T.C. Memo. 1960–177; cf. *Easson v. Commissioner*, 294 F. 2d 653; see Berl, "Disposition of Property Mortgaged in Excess of Basis," 19th Ann. N.Y.U. Tax Inst. 1033, 1040 (1961); Drye, "Income Tax Effects of Mortgages," 17 Wash. & Lee L. Rev. 1, 13–14 (1960). Thus, we need not determine petitioners' adjusted basis in the property transferred, cf. *Herff v. Roundtree*, 140 F. Supp. 201 (M.D. Tenn. 1956); Spears, "Mortgages in Excess of Basis," 1955 U. So. Calif. Tax Inst. 883, 902, nor need we determine whether an affirmative answer to the question of realization would affect either of respondent's contentions under sec. 677.

[11] In *Barber v. United States*, 251 F. 2d 436, 438 (C.A. 5, 1958), the Fifth Circuit, after noting the taxpayer's reliance on *Hays' Estate* and *Greenwald*, made the following reference to those decisions: "*Irrespective of the soundness of our decisions in either of these two cases * * *, we are of the clear opinion that they do not control * * * this case * * *.*" (Emphasis added.)

[12] Throughout our opinion, we have referred to the reversionary interest in the corpus as being vested in Irvine. We have done so merely for convenience and without intending to determine the rights, if any, of Lorena in the reversion. Cf. fn. 2, *supra*.

[13] The income tax liability of the trust for the periods in question is not before us. See secs. 1311–1315.